UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DAMION SMITH,

    Plaintiff,

v.                                            Case No.:  2:23-cv-197-SPC-KCD

AQUATECH DEWATERING AND
PUMPING TECHNOLOGIES,

    Defendant.
_____/

## OPINION AND ORDER

Plaintiff Damion Smith[1] brought this employment discrimination and retaliation action under Title VII of the Civil Rights Act and the Florida Civil Rights Act (FCRA).  Before the Court is Defendant's Motion for Summary Judgment.  (Doc. 51).  Plaintiff filed a response (Doc. 57), and Defendant replied (Doc. 59).  The motion is now ripe for review.  For the below reasons, the Court grants Defendant's motion for summary judgment.

## BACKGROUND[2]

Defendant is a company that distributes and installs specialized equipment for dewatering.  Plaintiff, an African American man, began working

---

[1] Although Plaintiff was initially represented by counsel, he is now proceeding pro se.
[2] Unless otherwise noted, the below facts are undisputed.  For several facts, Plaintiff's only opposition is that Defendant failed to provide supporting documentation.  But such facts are supported by affidavits based on personal knowledge, which is acceptable.  *See* Fed. R. Civ. P. 56(c)(1)(A), (c)(4).  So these facts are treated as undisputed.

for Defendant as a "well point installer/laborer" in December 2020 making $15 per hour. His duties included delivering, assembling, and installing dewatering and bypass pumping systems, maintaining equipment, loading and unloading equipment, general housekeeping, and other duties as needed. A couple of months prior, Steven Gilmore, a Caucasian man, was also hired as a well point installer/laborer with the same pay rate. While both Plaintiff and Gilmore started with the same hourly wage, this changed after their 90-day performance reviews.

Gilmore's review occurred first on January 4, 2021. According to the operations manager, Zach Klein, Gilmore's performance had exceeded expectations, including a good work ethic, initiative, and a willingness to work overtime. So Gilmore was given a $1.50 hourly raise, bringing his hourly rate to $16.50. Plaintiff's 90-day review, which occurred two months later, did not go as well. Klein stated that Plaintiff would take unpermitted breaks when unsupervised, he received customer complaints for his lack of effort, he could not be reached on weekends, and other employees complained that they did not want Plaintiff assigned to their projects.[3] Given this poor evaluation, Plaintiff was not given a raise, and his wage remained at $15 per hour.

---

[3] Plaintiff only remembers "bits and pieces" of this review but recalls Klein being "really critical." (Doc. 52 at 32:13-16).

Over the next couple of months, Klein observed Gilmore's performance and development continuing to progress. So, after a leadership position became available—Crew Leader—Gilmore was promoted to this role, effective May 24, 2021. With this new position came new leadership and communication responsibilities and another raise to $18 per hour.[4]

Fast forward a few months, Klein still had not seen much improvement in Plaintiff's performance.  Even so, in June 2021, he authorized a $0.50 hourly increase bringing Plaintiff's hourly rate to $15.50.  Although Plaintiff expressed his dissatisfaction with this figure to Klein, he never complained or suggested that he was being unfairly compensated due to his race.  By September 2021 though, Klein observed improvement in Plaintiff's job performance and increased his pay to $16.50 per hour (which is also the highest amount Gilmore was paid in his role as laborer).  Klein left the company shortly thereafter.  And on October 4, 2021, Gilmore was terminated.[5]

On October 21, Plaintiff emailed Howard Blair—Defendant's vice president—expressing his dissatisfaction with his pay rate and requesting a raise. (Doc. 58-2).  Four days later, after a sit-down with Blair, Plaintiff's

---

[4] Klein's affidavit states that this raise became effective in May *2022*. (Doc. 54 ¶ 9). But since the briefing says May 2021 and other exhibits confirm this (Doc. 53 at 14), the Court presumes the date provided in the affidavit was a scrivener's error and the briefing includes the proper date.  This also makes logical sense, given Gilmore was no longer working for Defendant in 2022.

[5] The reason for this termination is unclear from the record.

hourly wage was increased to $18 per hour. Again, there was no suggestion (in the email or during the sit-down) that his unsatisfactory pay rate was due to his race. (Doc. 52 at 38:7-20; Doc. 58-2). Although he still held a laborer position, Plaintiff was now making the same rate that Gilmore was making in his leadership role (prior to his termination).

At the start of the new year, Dominick Ruggiero was hired as Defendant's Director of Operations to replace Klein. During his first month, Ruggiero felt Plaintiff was showing initiative. So, at Plaintiff's yearly performance review, he promoted Smith to crew leader, effective January 31, 2022. This promotion resulted in a pay increase to $19 per hour—more than Gilmore was making in the same position.[6]

When February rolled in, Plaintiff saw an opportunity to educate his coworkers on Black History Month. Throughout the month, he circulated several emails to his colleagues with various articles highlighting different Black historical figures and civil rights events. (Doc. 52-7). He never received any pushback or negative responses to these emails except, on one instance, he overheard a service manager ask another employee, "why is he sending that?" Even so, Plaintiff never issued any complaint to management.

---

[6] Oddly, Plaintiff disputes in his Response that he was promoted, claiming he always held the laborer position. But Defendant provided Plaintiff's "Compensation Adjustment Form," which reflects a position change to crew leader. (Doc. 52-6). Plaintiff signed this form. (*Id.*) Plaintiff also admits he was promoted to crew leader in his deposition. (Doc. 52 at 42:22-43:6, 46:21-47:3). He also admits this later in his Response. (Doc. 57 at 18).

4

In March 2022, Plaintiff experienced a payroll hiccup. One of his paychecks was short $200. As it turned out, the payment had been inadvertently deposited into another employee's account. In his deposition Plaintiff claims this error "could have been" racially motivated (Doc. 52 at 55:1-5), but in his Response he concedes it was inadvertent. Either way, he never complained that this error was racially motivated, and it was rectified within a day or two.[7]

During the first quarter of 2022, business was slow for Defendant at the Fort Myers branch. It nevertheless decided not to downsize and continued paying its employees up to 40 hours per week. A reason for this decision was to ensure employees were available if a need arose. This was a good decision because, in late March, a project in Orlando required Defendant's immediate attention. Since business was slow in Fort Myers, Ruggiero found it sensible to send a few employees to work on the Orlando job. The evening before the Orlando project was set to begin, Plaintiff and two other employees were asked to assist. But because of the short notice, Plaintiff declined.

Plaintiff's unwillingness to work the Orlando project sparked a conversation between Ruggiero and the Fort Myers branch manager, Blake

---

[7] In his Complaint, Plaintiff also cited another payroll instance in which he was not paid his $19 hourly rate. (Doc. 1 ¶¶ 14-15). Defendant addresses this allegation in its Motion. (Doc. 51 at 5). But in his Response, Plaintiff suggests this error never occurred (Doc. 51 at 9), so the Court presumes he has abandoned this allegation.

McCullers. Given the lack of business in Fort Myers, Ruggiero felt it made little sense to retain an employee who would not work where and when it is needed. McCullers agreed. So on April 1, 2022, Ruggiero terminated Plaintiff for his refusal to work the Orlando project.[8] Although McCullers agreed, Ruggiero made the ultimate decision to terminate Plaintiff.

Plaintiff now brings this action for unequal pay and retaliation. He claims he "was subjected to disparate treatment based solely on his race" and that Defendant "failed to take sufficient remedial actions when [he] complained about the disparate treatment[.]" (Doc. 1 ¶¶ 31, 42). He also believes Defendant treated a similarly situated white male employee—Gilmore—with more favor because Gilmore was paid more for performing substantially similar tasks. (Doc. 1 ¶ 32). And he claims his termination was retaliation for complaining to management for their failure to pay him the correct wage and circulating emails to employees about Black History Month. (Doc. 1 ¶¶ 37, 50).

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[8] The record is unclear what came of the other employees who refused to work the Orlando project. All the same, Plaintiff acknowledges that he is unaware of any white employee that also refused but was not terminated. (Doc. 57 at 16).

to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden to show a lack of genuinely disputed material fact. *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th Cir. 1991). If carried, the burden shifts to the nonmoving party to point out a genuine dispute. *Id.* At this stage, courts view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

## DISCUSSION

Plaintiff argues Defendant underpaid him because of his race in violation of Title VII and the FCRA.[9] To present a prima facie case under Title VII for unequal pay, Plaintiff must show he was paid less than a member of a different race was paid (a "comparator") for work requiring substantially the same responsibilities. *Smith v. Thomasville Georgia*, 753 F. App'x 675, 697 (11th Cir. 2018). Plaintiff and the comparator "must be similarly situated in all

---

[9] Because the FCRA is patterned after Title VII, the Court analyzes Plaintiff's FCRA claims under the same legal framework as his Title VII claim. *Chambers v. Fla. Dep't of Transp.*, 620 F. App'x 872, 877 n.4 (11th Cir. 2015).

7

relevant respects." *Id.* (citation omitted).  If he cannot show a similarly situated employee, Defendant is entitled to summary judgment "where no other evidence of discrimination is present." *Id.*  Plaintiff fails to present a prima facie case.

Plaintiff points to one employee as a comparator: Gilmore.  Plaintiff and Gilmore started on equal footing making $15 per hour as laborers, but Gilmore received multiple raises and a promotion, eventually making $18 per hour during his tenure.  Conversely, during this same time frame, Plaintiff received raises up to $16.50 without any promotion.  Ignoring the fact that $16.50 was the most Gilmore made as a laborer, that Plaintiff was later promoted to crew leader (the same position Gilmore held), and that Plaintiff made $19 per hour as a crew leader (more than Gilmore ever made), Plaintiff and Gilmore were not similarly situated.  The plaintiff received poor performance reviews, and Gilmore reportedly exceeded expectations.  Indeed, when Plaintiff's performance improved, he was compensated accordingly.  *See Chambers v. Fla. Dep't of Transp.*, 620 F. App'x 872, 879 (11th Cir. 2015) (the plaintiff's "proffered comparators were not similarly situated to her—none had a history of poor work performance"); *Adamson, v. City of Birmingham, Alabama*, No. 24-11201, 2024 WL 5088414, at *4 (11th Cir. Dec. 12, 2024) ("To be a valid comparator, the non-white employee must . . . [have] shared the plaintiff's employment or disciplinary history.").  Moreover, while Plaintiff was still a

8

laborer, Gilmore was promoted to crew leader, which required him to fulfill certain leadership and communication responsibilities not required in the laborer position. So the two did not share "substantially the same responsibilities." *See Smith*, 753 F. App'x at 697; *Sumerlin v. AmSouth Bank*, 242 F. App'x 687, 690 (11th Cir. 2007) ("An employee is similarly situated if she performs 'the same type of tasks' as the plaintiff."). Given the difference in performance reviews and responsibilities, Gilmore is not an adequate comparator.[10] Indeed, whenever the two were on equal footing, Plaintiff was paid the same or more than Gilmore.

Nor has Plaintiff shown other evidence of discrimination. When a plaintiff fails to show a comparator, it may present a convincing mosaic of circumstantial evidence to meet his prima facia burden. *McPhie v. Yeager*, 819 F. App'x 696, 699 (11th Cir. 2020). No such mosaic exists. While there is the payroll mishap, Plaintiff only suggested that this "could have been" racially motivated and eventually conceded it was inadvertent. To be sure, though, he has proffered no evidence, direct or circumstantial, to suggest the mistake was

---

[10] In an apparent attempt to discredit Gilmore's exceptional performance reviews, Plaintiff attaches booking information suggesting Gilmore was arrested in October 2020 for violation of probation. (Doc. 58-1). But this point is irrelevant. There is no suggestion Defendant knew of this arrest, that the arrest related to his employment, or that the arrest effected his job performance. In other words, the arrest does not render his performance reviews erroneous or his compensation unjustified. And regardless, it is not the Court's role to second-guess Defendant's business judgments. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004).

anything but accidental. He also mentions in his Response that, in March 2022, Defendant hired two new white male employees in superior positions to those held by African American employees. (Doc. 57 at 18, 19; Doc. 58 ¶ 13). But there is no other information about these individuals other than their race and sex, so it does not support a finding of racial discrimination. *See Smith*, 753 F. App'x 675 at 697; *Adamson*, 2024 WL 5088414, at *4 ("[T]he mere fact that Adamson is white and his supervisors were black does not support a reasonable inference of discriminatory intent."). Without a comparator or any other evidence of discrimination, Defendant is entitled to summary judgment on Plaintiff's discrimination claims.

Next are Plaintiff's retaliation claims. "Title VII prohibits retaliation against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" 42 U.S.C. § 2000e–3(a). "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *McMillian v. Postmaster Gen., U.S. Postal Serv.*, 634 F. App'x 274, 277 (11th Cir. 2015) (citation omitted). Plaintiff claims his termination was retaliatory for three instances of purportedly protected expression: (1) his complaints of dissatisfaction with his hourly wage; (2) his complaint that his

paycheck was short $200; and (3) his Black History Month emails circulated to his colleagues. But none of these constitute protected expression.

Plaintiff's objections to his pay and the payroll mishap were general complaints rather than protected activity. To constitute protected expression, "[i]t is not enough for the employee merely to complain about a certain policy or certain behavior of co-workers and rely on the employer to infer that discrimination has occurred." *Webb v. R & B Holding Co.*, 992 F. Supp. 1382, 1389 (S.D. Fla. 1998). Rather, "[i]t must appear that the plaintiff is engaging in a protected activity as opposed to launching a general complaint that is unrelated to discrimination." *Greene v. Sch. Bd. of Broward Cnty.*, No. 13-62644-CIV-MORENO, 2014 WL 3950387, at *4 (S.D. Fla. Aug. 12, 2014). Plaintiff concedes that he complained to Klein and Blair about his low pay rate generally without any suggestion of racial discrimination. Nor did he suggest to anyone that the payroll error was racially motivated. Without express objections to racial discrimination, Plaintiff's complaints were not protected activity.[11] *See Marcelin v. Eckerd Corp. of Fla.*, No. 8:04-CV-491-T-17MAP,

---

[11] For what it's worth, Plaintiff's Declaration mentions three other "dialogues" with colleagues regarding racial disparity in the workplace. (Doc. 58 ¶¶ 9-11). But the record suggests none of these colleagues—Hector Santiago, Dejon Agent, and Andrew Destiche—are Plaintiff's superiors. Thus, Plaintiff's conversations with them are not protected activity. *See Burns v. Alabama Power Co.*, No. 6:15-CV-02332-LSC, 2017 WL 1491304, at *6 (N.D. Ala. Apr. 25, 2017) (noting informal complaints "must be made to the employee's 'superior' so as to provide notice of the discrimination to the employer."). Besides, vague assertions of a "dialogue" about racial discrimination do not support a prima facie case.

2006 WL 923745, at *9 (M.D. Fla. Apr. 10, 2006) (finding no protected activity when the plaintiff "concede[d] that he did not complain expressly about racial or national origin discrimination").

Even assuming these complaints were protected expression, Plaintiff cannot establish a causal connection between them and his termination. Plaintiff concedes that Ruggiero knew nothing about the complaints at the time he fired Plaintiff. But to establish a causal relation, the decisionmaker must know of the protected expression at the time he takes adverse employment action. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1057 (11th Cir. 2020); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action."). Because Ruggiero—the decisionmaker—did not know of Plaintiff's wage and payroll complaints, they do not support a retaliation claim.

The Black History Month emails are not protected expression either. "Under Title VII, an employee has engaged in protected activity if [he] has: (1) opposed an unlawful employment practice, or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII's retaliation provision." *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 777 (11th Cir. 2014); 42 U.S.C.A. § 2000e-3(a).

Plaintiff's emails contained only information about civil rights and Black historical figures. They did not include opposition to any unlawful employment practice and thus are not protected activity. Because Plaintiff did not engage in protected activity, Defendant is also entitled to summary judgment on the retaliation claims.

Accordingly, it is now

**ORDERED:**

Defendant's Motion for Summary Judgment (Doc. 51) is **GRANTED**. The Clerk is **DIRECTED** to enter judgment for Defendant and against Plaintiff, terminate any deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on December 19, 2024.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record